UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK DUVALL, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>HAIER US APPLIANCE SOLUTIONS, INC.,<br><br>    Defendant. | Case No. 25-cv-02794-JSC<br><br>**ORDER RE: MOTION TO DISMISS**<br><br>Re: Dkt. No. 28 |

Plaintiffs bring this putative class action arising from allegedly defective two-in-one combination washer dryer appliances ("Class Appliances") manufactured by Defendant GE Appliances. In their Second Amended Complaint ("SAC"), Plaintiffs allege Defendant failed to disclose a defect in the Class Appliances' lint trap, which "caus[es] the Class Appliances to suffer excessive lint buildup … that is difficult to remove, greatly diminishing the effectiveness of the dryer and leaving its contents wet." (Dkt. No. 27 ¶ 2.)[1] Plaintiffs further assert Defendant "refuses to honor its warranties to Class Members by declining to repair the known defect." (Dkt. No. 27 at 9.)

Plaintiffs bring seven causes of action: 1) violation of California's Consumer Legal Remedies Act ("CLRA"), 2) violation of the California False Advertising Law ("FAL"), 3) violation of the California Unfair Competition Law ("UCL"), 4) breach of express warranty under California's Song-Beverly Act, 5) breach of the implied warranty of merchantability under the Song-Beverly Act, 6) breach of express warranty under the Uniform Commercial Code § 2-313, and 7) breach of the implied warranty of merchantability under California Commercial Code §§

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

2314 and 10212. Defendant moves to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6).

After considering the parties' submissions, and with the benefit of oral argument on October 16, 2025, the Court GRANTS WITH LEAVE TO AMEND the motion to dismiss for failure to state a claim as set forth below.

## DISCUSSION

### I.     Plaintiffs' Express Warranty Claims

Plaintiffs bring express warranty claims under two statutes: the Song-Beverly Act and Uniform Commercial Code ("U.C.C.") section 2-313. Plaintiffs allege Defendant failed to disclose a defect in the Class Appliances' lint trap that causes excessive lint buildup. As a result of this defect, the Appliances dried clothes much more slowly than Defendant advertised, and in some instances, failed to dry clothes altogether. Additionally, lint builds up around the Appliances' condenser coils, thereby restricting airflow and creating a fire hazard.

Plaintiffs allege two theories as to why Defendant violated an express warranty: 1) Defendant failed to replace parts, in violation of the product's Limited Warranty, and 2) the Class Appliances' failure to dry clothes violated Defendant's advertising and product information.

### A.  Limited Warranty

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Group., Inc.*, 505 U.S. 504, 525–526 (1992). Here, Defendant provided an express Limited Warranty to "replace … any part of the unit which fails due to a **defect in materials or workmanship**. During this limited one-year warranty, we will also provide, free of charge, all labor and related service to replace the defective part." (Dkt. No. 28–2 at 2 (emphasis added).) The parties dispute whether the SAC alleges a "defect in materials or workmanship."

"California recognizes two distinct categories of products defects: manufacturing defects and design defects." *McCabe v. Am. Honda Motor Co.* 1011 Cal.App.4th 1111, 1120 (2002).

> A manufacturing defect exists when an item is produced in a substandard condition. Such a defect is often demonstrated by showing the product performed differently from other

2

ostensibly identical units of the same product line. A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective.

*Id.* at 1119–20. "An express warranty covering 'materials and workmanship' does not include design defects. … Therefore, Plaintiffs may not base their express warranty claims on design defects because Defendant's limited warranty guarantees against 'materials and workmanship.'" *Horvath v. LG Electronics Mobilecomm U.S.A., Inc.*, 2012 WL 2861160 *5 (S.D. Cal. Feb. 13, 2012) (collecting cases)).

Here, Plaintiffs' SAC alleges a design defect, not a manufacturing defect. The SAC begins by alleging the Class Appliances "were manufactured by Defendant with defective lint traps," which is shortened to the singular phrase "the Defect." (Dkt. No. 27 ¶ 2.) Plaintiffs allege "[a]ll Class Appliances share" this defect, (*id.* ¶ 3), which is the opposite of alleging "the product performed differently from other ostensibly identical units of the same product line." *McCabe*, 1011 Cal.App.4th at 1119–20. Plaintiffs also describe the defect as "inherent" five times. (Dkt. No. 27 ¶¶ 54, 61, 62, 147, 166.) By contrast, the SAC's only instance of the phrase "manufacturing defect" is the boilerplate allegation that "the Class Appliances suffer from a defective design(s) and/or manufacturing or materials defect(s)." (*Id.* ¶ 178.)

The alleged cause of the defect also supports an issue of design, not manufacturing. Plaintiffs allege "[t]he Defect occurs due to gaps found in the lint trap assembly" and quote Defendant's website as saying this gap "is normal" and "intentional." (*Id.* ¶ 34.) The website explains the purpose of the gap is "so that if lint or foreign objects fall on the filter track, they can be pushed back to avoid blocking the filter or preventing the filter from sliding back into the closed position." (*Id.*) Plaintiffs then construe the website to say the "lint trap assembly was ***designed*** with this gap in mind." (*Id.* ¶ 35 (emphasis added).)

Plaintiffs then identify two problems arising from the gap. First, the lint trap "fail[s] to capture all the lint created." (*Id.*) Second, "lint also finds its way onto the condenser coils," which "reduces the efficiency of the drying process" and creates a fire risk. (*Id.* 35–40). Plaintiffs claim the first problem "indicates a problem in materials or workmanship" but do not explain why this inference is plausible. (*See id.* ¶¶ 35–40); *in re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th

3

Cir. 2008) ("[T]he court need not accept as true conclusory allegations[.]").  Given Plaintiffs repeatedly allege the defect is "inherent," "shared" by "[a]ll Class Appliances," and "occurs due to" an "intentional" and "normal" gap in the lint trap, (Dkt. No. 27 ¶¶ 3, 34, 54, 61, 62, 147, 166), the SAC only alleges a design defect, not also a manufacturing or workmanship defect.  *See Troup v. Toyoca Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013) ("Despite its scattered references to 'materials', the gravamen of the complaint is that the Prius's defect resulted … a design decision.")

In their Opposition Brief, Plaintiffs emphasize "consumer complaints showing the dryer malfunctioning at different times and with different degrees of intensity during the product lifecycle indicate a manufacturing defect." (Dkt. No. 34 at 16.)  But Plaintiffs do not describe variations in the consumer complaints in this manner in the body of the SAC.  (*See, e.g.*, ¶¶ 42–46 (describing consumer complaints generally), ¶ 58 (describing "the experience of Plaintiffs and Class Members" in a uniform way).) Rather, the consumer complaints are attached as an exhibit, with no allegation explicitly tying the variation of complaints into Plaintiffs' boilerplate allegation of "a defective design(s) and/or manufacturing or materials defect(s)."  (*Id.* ¶ 178.)  So, a manufacturing defect is not sufficiently alleged.

Because the Limited Warranty on its face does not apply to a design defect, the Court need not address the parties' arguments about Plaintiffs' reliance on the Limited Warranty, multiple service attempts, and unconscionability because those arguments assume the Limited Warranty's application.

**B.  Defendant's Advertising and Product Information**

Plaintiffs also assert claims for breach of express warranty under the Song-Beverly Act and California Commercial Code § 2313. "The Song-Beverly Act is a remedial statute designed to protect consumers who have purchased products covered by an express warranty.... A buyer of consumer goods who is damaged by the manufacturer's failure to comply with the act may bring an action to recover damages and other legal and equitable relief." *Robertson v. Fleetwood Travel Trailers of Cal., Inc.*, 144 Cal.App.4th 785, 799 (2006). The Song-Beverly Act does not itself define "express warranty." Civ. Code § 1792. Rather, the definition comes from the U.C.C., which

4

provides an express warranty is created by:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Cal. Com. Code § 2313. "Hence, to prevail on a breach of express warranty claim, the plaintiff must prove (1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Weinstat v. Dentsply Internat., Inc.*, 180 Cal. App. 4th 1213, 1227 (2010) (cleaned up). "When there is no privity of contract, California law requires a showing that a plaintiff relied on an alleged warranty." *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F.Supp.3d 1306, 1334 (C.D. Cal. 2013).

Plaintiffs do not plausibly allege an express warranty based on advertising and product information because Plaintiffs do not specify what statements form the basis of their claim. Plaintiffs' SAC contains a URL to a website describing the Class Appliance, but the URL appears 60 paragraphs before the generic allegations that Plaintiffs "researched the Class Appliance prior to purchase, including by viewing GE Appliances' product information and advertisements online[.]" (Dkt. No. 27 ¶¶ 5, 5 n.1; 65; 76.) Thus, Plaintiffs' complaint does not sufficiently allege what statements created an express warranty and upon which Plaintiffs relied.

\*\*\*

Accordingly, the Court GRANTS the motion to dismiss Plaintiffs' express warranty claims, with leave to amend.

**II.    Implied Warranty Claims**

Plaintiffs assert violations of the Implied Warranty of Habitability under the Song-Beverly Act and California Commercial Code sections 2314 and 10212. Both statutes provide there is an implied warranty of merchantability in every sale of goods. Cal. Civ. Code § 1792; Cal. Com. Code § 2314(1).

//

### A. Merchantability of the Class Appliances

Goods are merchantable if they "are fit for the ordinary purposes for which such goods are used." *Id.* §§ 2314(2)(a), (c); Cal. Civ. Code § 1791.1(a)(2). As relevant here, being "fit for the ordinary purpose" means two things. First, a product must be "in safe condition and substantially free of defects," which is violated when a defect "creates a substantial safety hazard." *Brand v. Hyundai Motor Am.*, 226 Cal. App. 4th 1538, 1546–47 (2014). Second, a product is unfit when it does not "possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (2003). Under the second prong, "merchantability should not be evaluated at the component level [and] the product should be analyzed as a whole." *Corzine v. Whirlpool Corp.*, 2016 WL 647172 *3–4 (N.D. Cal. Nov. 2, 2016) (upholding claim that a leaking fridge was defective because "in addition to keeping food cold, the refrigerator had a purpose of properly channeling defrosted water so as to avoid leakage"). Here, Plaintiffs assert the Class Appliances are unfit for ordinary use under both prongs because the defective lint traps cause excessive lint buildup, which creates a safety hazard and decreases the effectiveness of drying clothes.

Plaintiffs do not plausibly allege an unreasonable safety risk. Plaintiffs allege the excessive lint "finds its way onto the condenser coils," which "can block the airflow through the condenser coils." (Dkt. No. 27 ¶¶ 35, 36.) The "accumulation of lint combined with the high operating temperature of the Class Appliance" creates a "risk of overheating and catching fire." (*Id.* ¶ 12.) But Plaintiffs allege nothing beyond this hypothetical "risk." Both Plaintiffs allege they "began to experience … a buildup of lint on condenser coils," (*id.* ¶¶ 66, 77), but do not allege any incidents of "overheating [or] catching fire." (*Id.* ¶¶ 12, 65-83.) So, the Court dismisses Plaintiff's implied warranty claims to the extent they rely on an unreasonable safety hazard. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1028–29 (9th Cir. 2017) ("[T]he SAC lacks any allegations indicating that any customer, much less any plaintiff, experienced such a fire–a notable omission if the alleged unreasonable safety hazard arises in *all* [Class Appliances.]"); *see also* Dkt. No. 27 ¶¶ 3, 54, 61, 62, 147, 166 (describing the defect as "inherent" and "share[d]"by all Class Appliances).

Plaintiffs' cited cases are unpersuasive. In *Roberts v. Electrolux Home Products, Inc.*, 2013

6

WL 7753579 (C.D. Cal. 2013), for example, the plaintiffs alleged they "used the dryer" and "the dryer caused a fire." *Id.* at *1. And in *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821 *9 (C.D. Cal. Nov. 8, 2013), the plaintiffs alleged "in great detail" a "tight causal relationship" when a dishwasher's design caused moisture to interact with conductive silver ink in the control panel's wiring, thereby creating a fire risk. *Id.* at *2–3, 9. Plaintiffs' allegations do not include the "great detail" supplied in *Apocada*, to make the fire risk plausible. *Compare generally id.*,[2] *with* Dkt. No. 27 ¶¶ 31–39 (alleging a fire hazard due to "high operating temperatures" and "restricted airflow).

But Plaintiffs sufficiently allege the Class Appliances do not "possess even the most basic degree of fitness for ordinary use." *Mocek*, 114 Cal.App.4th at 406. Drawing all reasonable inferences in Plaintiffs' favor, and analyzing the "product as a whole," a core purpose of the

---

[2] The *Apodaca* court described the plaintiffs' detailed fire risk allegations:

> The dishwasher's control panel has three components: a plastic frame, a plastic front cover interface ("Interface"), and a flexible membrane switch ("FMS") with a clear cover. The buttons on the Interface send signals to the control board connected to the FMS via a ribbon cable called a "tail." The ribbon cable passes from the front of the frame to the rear through an opening on the right side of the frame. There are visible lines running through the FMS, called "traces." The traces are printed on the FMS using conductive silver ink.
>
> The control panel fails because it becomes contaminated with moisture from the dishwasher. […] The moisture breaks down the coating on the traces, called the "solder mask."
>
> The silver traces can run close to each other, which creates a risk of migration. Silver migration is the ionic movement of silver between two adjacent traces. When the silver comes into contact with moisture under electrical potential, the silver is removed ionically from its original location and is redeposited as a metal (silver dentrite) in another location. The silver migration renders the circuit inoperable. An open circuit results when two silver traces have moisture between them and a voltage is applied. When this occurs, the plating current strips silver from one trace, the positive potential, and applies it to another trace, the negative potential. Eventually, all the silver is removed from the positive trace, resulting in an open circuit. Alternatively, a short circuit can occur where dendrite connects two traces. […]
>
> The detergent dispenser fails when moisture comes into contact with electrical components, such as the solenoid. The solenoid is a coil of wire that converts electrical energy to mechanical energy; it is used to receive the electrical signal sent from the control panel to the detergent dispenser. Moisture enters the solenoid housing during operation of the dishwasher and, over time, the moisture creates a short circuit. According to Plaintiffs, this short circuit can result in ignition or melting of the solenoid or neighboring materials.

*Apodaca*, 2013 WL 6477821 at *2–3 (internal citations omitted).

7

Appliance is to promptly dry clothes. (Dkt. No. 27 ¶ 46 ("Needing to run multiple drying cycles, with little to no improvement from one cycle to another, significantly interferes with an owner's ability to operate their Class Appliance in a way the reasonable consumer expects."); *cf. Corzine*, 2016 WL 647172 at *3–4 (reasoning, "based on the allegation[s]," refrigerators have dual purposes of keeping food cold and channeling water). Plaintiffs sufficiently allege the Appliances are unfit for this core purpose because the machines "failed to dry their contents a few months after purchase, even after running [them] multiple times." (Dkt. No. 27 ¶ 8.) Specifically, Plaintiffs' Appliances simultaneously "began to experience an increase in the time taken by the machine to dry" and a "buildup of lint on condenser coils" within a year of purchase. (*Id.* ¶¶ 63, 65, 66, 77.) Indeed, Plaintiff Duvall's machine "began to stop the drying cycle altogether" and, after a service attempt, he "has had to completely stop using the dryer mode of the device." (*Id.* ¶¶ 66, 68.)

Defendant argues Plaintiffs' allegations are not sufficiently specific, for instance, by not "describing the increase in drying time he experienced, or on what load types or sizes." (Dkt. No. 28 at 31 (internal citation omitted).) But at the motion to dismiss stage, courts do not require such a high degree of specificity as to the severity of a defect. *Corzine*, 2016 WL 6476172 *4 (no inquiry as to the severity of fridge leaks); *cf. Ashgari*, 42 F.Supp.3d at 1338–39 (accepting allegations that a car engine was "unable to utilize engine oil properly" and "consumes abnormally high amounts of oil" because whether a normal car would be unmerchantable at certain mileages is a question of fact) (internal quotation marks omitted). Further, Plaintiffs need not allege the "load types or sizes" they used because "[a] plaintiff's allegations need not defeat every alternative explanation" for why their clothes repeatedly failed to dry. *See Scheibe v. ProSupps USA, LLC*, 141 F.4th 1094, 1100 (9th Cir. 2025).

Accordingly, the Court DENIES Defendant's motion to dismiss on this basis.

**B. The One-Year Warranty's Application to the Implied Warranty Claims**

Defendant next asserts it did not deny Plaintiffs warranty coverage within the one-year warranty period. "Where the contract sets out a remedy, and 'the remedy is expressly agreed to be exclusive,' then it is the 'sole remedy.'" *Weeks v. Google LLC*, 2018 WL 3933398 *9 (N.D. Cal.

8

1   Aug. 16, 2018) (citing Cal. Comm. Code § 2719(1)(b)). Thus, an express warranty's durational

2   limit applies to the remedies available under the Implied Warranty of Merchantability. *Id.* Here,

3   the product's Limited Warranty provides that Plaintiffs' "sole and exclusive remedy is product

4   repair as provided in this Limited Warranty. Any implied warranties, including the implied

5   warranties of merchantability or fitness for a particular purpose, are limited to one year or the

6   shortest period allowable by law." (Dkt. No. 28–2 at 2.)

7   Plaintiff's allegations do not plausibly support an inference they were denied warranty

8   coverage within the one-year period. Plaintiff Duvall purchased the product in October 2023 and,

9   in September 2024, Defendant's representative serviced the Class Appliance at Plaintiff's home.

10  (Dkt. No. 27 ¶¶ 63, 68.) "The Defect returned two months later in November 2024," outside the

11  one-year warranty. (*Id.* ¶ 68.) So, Plaintiff Duvall does not allege he was denied repairs within a

12  year of purchase. Plaintiff Kassel alleges he purchased the product in July 2023 and "experienced

13  the … Defect in or around January 2024," but he does not allege he asked for a repair within one

14  year of purchase. (*Id.* ¶ 74–77.) Instead, he alleges "[Defendant] has refused to replace the

15  defective Class Appliances and cover additional losses experienced by Plaintiff and the Class."

16  (*Id.* ¶ 74, 77–78.) But this conclusory allegation does not plausibly support an inference

17  Defendant failed to comply with the one-year warranty.

18  Plaintiffs' insistence the limited warranty's one-year duration is invalid because it makes

19  the warranty fail of its essential purpose and is unconscionable is unavailing. First, under

20  California law, "a repair or replace remedy fails of its essential purpose only if repeated repair

21  attempts are unsuccessful within a reasonable time." *Philippine Nat. Oil Co. v. Garrett Corp.*, 724

22  F.2d 803, 808 (9th Cir. 1984) (italics removed). Here, Plaintiff Duvall alleges only one repair

23  request within the one-year period, not "repeated repair attempts." (Dkt. No. 27 ¶ 68.) Plaintiffs

24  counter there is no one-repair-attempt requirement because "[t]he number of attempts is a question

25  of reasonableness. *See* Cal. Civ. Code § 1793.2(d)." (Dkt. No. 34 at 21.) But Plaintiffs do not cite

26  any case suggesting one repair attempt is sufficient under California law to show a warranty failed

27  of its essential purpose. Second, "courts in this circuit have concluded a warranty's durational

28  terms are not substantively unconscionable, even when there are allegations that the defendant

concealed defects." *Drake v. Toyota Motor Corp.*, 2020 WL 7040125 *8 (C.D. Cal. Nov. 23, 2020) (collecting cases). Plaintiffs do not cite any California law to the contrary.

So, the Court GRANTS the motion to dismiss as to Plaintiffs' implied warranty claims. Accordingly, the Court need not address whether Count VII sufficiently alleges privity or a valid exception.

### III. CLRA, FAL, UCL, and Unjust Enrichment Claims

Federal Rule of Civil Procedure 9(b) requires fraud to be pled with particularity so a defendant "can defend against the charge and not just deny that they have done anything wrong." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (cleaned up). Here, Plaintiffs advance theories of fraudulent omission under the CLRA, FAL, UCL, and common law, all of which arise from the same factual allegations. Thus, the claims rise or fall together based on the plausibility of those allegations. *See Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017) ("Because the same standard for fraudulent activity governs [the UCL, FAL, and CLRA], courts often analyze the three statutes together."); *see also Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (analyzing California consumer protection statutes together since they share the same "reasonable consumer" test). A common law fraud claim, while similar to the consumer protection statutes, requires certain additional elements, such as knowledge of falsity. *See Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003) (establishing the elements of a fraud claim); *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1160 (N.D. Cal. 2011) ("California courts have also suggested that while claims of common law fraud require a deception 'known to be false by the perpetrator,' this element is not required to state a claim under the fraudulent prong of the UCL.") (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009)).

As set forth below, the Court GRANTS Defendant's motion to dismiss Plaintiffs' omission claims.

#### A. Rule 9(b) Particularity

Plaintiffs allege Defendant failed to disclose a defect while making partial representations about the Class Appliances' drying times and two-in-one capabilities. As such, Plaintiffs' claims

10

sound in fraud, and per Federal Rule of Civil Procedure 9(b), must be pled with particularity. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding Rule 9(b)'s heightened pleading requirement applies to California consumer protection statute claims sounding in fraud).Rule 9(b) typically requires a pleading "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 (9th Cir. 2020) (cleaned up). In an omission case, however, some district courts have held a plaintiff must "describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Marolda v. Symantec Corp*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009).

The Court need not decide which test to apply because Plaintiffs allegations fail to satisfy either standard. Plaintiffs do not identify which statements they saw. Plaintiffs allege they "researched the Class Appliance prior to purchase, including by viewing GE Appliances' product information and advertisements online, which stated fast laundry times of two hours[.]" (Dkt. No. 27 ¶¶ 65, 76.) Plaintiffs claim "[n]one of the marketing addressed the Lint Trap Defect," so Plaintiffs "relied on the ability of the Class Appliance to perform its basic function of drying in a standard manner when purchasing the device." (*Id.* ¶¶ 65, 76.) Yet Plaintiffs do not identify the 'what' and 'where' regarding this advertising and marketing because the only website URL the SAC identifies is 60 paragraphs before these allegations of reliance. (*Id.* ¶ 5, 5 n.1); *see supra*, Part I.B. In other words, Plaintiffs do not plausibly allege they viewed the website.

Likewise, Plaintiffs' failure to allege a source of Defendant's advertising and product information means Plaintiffs have not "provide[d] representative samples of advertisements, offers, or other representations" they relied on. *Marolda*, 672 F. Supp. 2d at 1002. And Plaintiffs' citation to *Goldstein v. General Motors, LLC,* 517 F. Supp. 3d 1076, 1087 (S.D. Cal. Feb. 3, 2021) is unpersuasive. Although Plaintiffs have "pled specific information channels" such as Defendant's website, *id.*, Plaintiffs have not alleged they specifically "relied on" these channels. *Marolda*, 672 F. Supp. 2d at 1002.

11

Accordingly, the Court DISMISSES Plaintiffs' CLRA, FAL, UCL, and Unjust Enrichment claims, with leave to amend.

### B. Defendant's Knowledge of the Defect

"[P]laintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012). Plaintiffs offer two theories as to how Defendant knew of the lint trap defect: Defendant's pre-sale product testing and customer complaints. Together, the facts underlying these theories plausibly allege Defendant knew of the defect at the time of sale.

Plaintiff alleges a highly detailed testing regime for the Class Appliance, which supports an inference Defendant knew of the defect. Plaintiff quotes Defendant's "Lead Designer of the Class Appliance, Ken Rudolph" who represented Defendant undertook three types of testing: "laboratory testing," "field testing," and "real-world testing" where Defendant "tortured test [sic] the hell out of" the Class Appliance in "about two dozen homes." (Dkt. No. 27 ¶¶ 48-49.) Mr. Rudolph also claimed Defendant tested the Class Appliance under three separate protocols: standards for washers, for dryers, and for combined washer-dryers that Defendant created themselves. (*Id.* ¶ 48.) Defendant's regime "monitor[ed] the entire cycles" and tested a "variety of loads," including "loads that were deficiently covered in standard wash and test protocols." (*Id.* ¶ 49.) Plaintiff's SAC has a URL link to Mr. Rudolph's video interview and a transcript of his comments. (*Id.* ¶¶ 48-50 n.15-19.)

The breadth and detail of Defendant's alleged testing scheme, coupled with post-sale consumer complaints, supports an inference of Defendant's knowledge because the complaints are sufficiently voluminous, temporally proximate to the time of purchase, and related to the alleged defect. Plaintiff attaches roughly 95 pages of negative customer reviews from Defendant's website and two retailer's websites. (Dkt. No. 27-2.) Many of these complaints stated the customer's clothes were unable to dry within days of purchasing the Class Appliance. (*See, e.g.*, *id.* at 3 ("clothes take for ever [sic] to dry" and lint began collecting within "a few days" of purchase), at 4 ("laundry comes out barely dried" after a purchase "earlier this month"), at 5 ("We have had this product for less than a month, and it will no longer dry out clothes" and "[F]rom day 1 that I

12

1    purchased machine clothes never come out dry.")). These complaints mirror Plaintiffs'

2    experiences with the Class Appliance. (*Compare generally, id.* at 3-5 (complaints shortly after

3    purchase regarding lint buildup and laundry not drying), *with* Dkt. No. 27 ¶¶ 66-67, 77-78)  And

4    Defendant even promptly responded to the above-cited complaints "an agent will be reaching out

5    to you by email," which suggests Defendant learned of the alleged defect. (*Id.* at 3-5.)

6        Defendant emphasizes the number of consumer complaints is too small to put it on notice

7    of the lint trap defect as it sold "thousands" of appliances and Plaintiffs' complaints represent only

8    "1.3% of total reviews." (Dkt. No. 28 at 20–21.)  As support Defendant cites several cases where,

9    broadly speaking, consumer complaints were not sufficiently voluminous, close in time to the

10   plaintiff's purchase, or related to the product to put a manufacturer on notice of a defect. (*Id.*

11   (citing, *e.g.*, *Sloan v. General Motors LLC*, 2017 WL 3283998 *8 (N.D. Cal. Aug. 1, 2017) (82

12   complaints over seven years was insufficient); *Cho v. Hyundai Motor Co.*, 636 F. Supp. 3d 1149,

13   1168 (C.D. Cal. Oct. 21, 2022) (400 complaints, many of which were not about the class vehicle,

14   were insufficient over 12-year period); *Cadena v. American Honda Motor Co., Inc.*, 2019 WL

15   3059931, at *12 (30 complaints insufficient where 18 of them were posted after the plaintiffs'

16   purchases and all complaints were on websites the defendant did not monitor); *Pelayo v. Hyundai*

17   *Motor Am., Inc.*, 2021 WL 1808628, at *6 (C.D. Cal. May 5, 2021) (knowledge that an engine was

18   "prone to fires" not established by "generalized complaints about cars" to government agencies)).

19       Defendant's cases are distinguishable. Here, although it is unclear which, if any, consumer

20   complaints pre-date Plaintiffs' purchases, each complaint was about the Class Appliance and

21   posted within a year or two,[3] as opposed to a period of 7 or 12 years. *Compare generally* Dkt. No.

22   27-2, *with Sloan*, 2017 WL 3283998, at *8, *and Cho*, 636 F. Supp. 3d at 1168. Unlike the

---

[3] The parties have differing interpretations regarding when the earliest customer review was posted. The first 72 pages of these complaints do not have specific dates, so the earliest of these reviews was posted "a year ago." (*See generally* Dkt. No. 27-2 at 1–76.) The remaining complaints have dates, but the earliest review is from 2024–months after Plaintiffs' purchases. (*See generally id.* at 77-95.) At no point does the SAC allege when these dates were compiled. *(See generally* Dkt. No. 27.) Because it is unclear which, if any, consumer complaints pre-date Plaintiffs' purchases, the timestamps do not enable Defendant to "defend against the charge and not just deny that they have done anything wrong." *United Healthcare*, 848 F.3d at 1180 (cleaned up). That said, Plaintiff's ability to elaborate on these dates suggests this issue is curable.

13

1  manufacturers who did not monitor consumer complaints, here, Defendant responded to at least
2  100 complaints on its own website, often saying an agent will follow up with the complaining
3  customer. *Compare generally* Dkt. No. 27-2 at 1-55, *with Cadena*, 2019 WL 3059931 at *12 (no
4  allegation Plaintiff monitored the websites), *and Pelayo*, 2021 WL 1808628 at *6 (alleging the
5  defendant was legally obligated to monitor complaints to a government agency is not the same as
6  alleging defendant saw the complaints). Finally, the inference that Defendant learned of a defect
7  through these complaints is even more plausible in conjunction with Plaintiffs' allegations of a
8  detailed testing regime that is corroborated by an interview with the Class Appliances' lead
9  designer. (Dkt. No. 27 ¶¶ 48-50 n.15-19); *see Almeida v. Apple, Inc.*, 2023 WL 3149252, at *1
10 ("[E]ven those complaints that post-date the plaintiffs' purchases support the inference–at least
11 when combined with the pre-release testing allegations–that Apple was on notice of the defect …
12 if ordinance use by consumers so readily revealed the defect, surely Apple's targeted testing did
13 too.")

Accordingly, the Court DENIES Defendant's motion to dismiss on the basis of
Defendant's knowledge of a defect.

### C. Defendant's Duty to Disclose

A misrepresentation claim based on omission requires either that the omission was "contrary to a representation actually made by the defendant," or "the defendant was obliged to disclose" the information. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018). Here, the alleged omission is Defendants' failure to disclose the existence of a defect in the lint trap. (*See, e.g.*, Dkt. No. 27 ¶¶ 4, 28, 89, 102.) Plaintiffs proceed under the second theory of fraudulent omission—namely, Defendants were "obliged to disclose" the existence of the defect. Under California law, there are four scenarios in which a defendant is obligated to disclose information:

> (1) when the defendant is in a fiduciary relationship with the plaintiff;
> (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff;
> (3) when the defendant actively conceals a material fact from the plaintiff; and
> (4) when the defendant makes partial representations but also suppresses some material facts.

14

*LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). Here, Plaintiffs have plausibly alleged "the defendant had exclusive knowledge of material facts not known to the plaintiff."

A fact is material "if a reasonable consumer would attach importance to it *or* if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'" *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (emphasis in original), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013). Moreover, "materiality is generally a question of fact" not appropriate for disposition on a motion to dismiss. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 333 (2011). The SAC addresses materiality through allegations that "[h]ad [Defendant] disclosed the Defect, Plaintiff[s …] would not have purchased [their] Class Appliance or would have paid less to do so." (*See, e.g.*, Dkt. No. 27 ¶¶ 70, 80.) As to Defendants' knowledge of the material fact, the Court reiterates its analysis of Plaintiffs' knowledge allegations above. *See* Part II.B, *supra.* Plaintiffs plausibly allege Defendant knew of the defect prior to selling the Class Appliances, and such information was material to consumers. As Defendant's exclusive knowledge is sufficient to establish a duty to disclose, the Court need not address the other three scenarios under which Defendant may have a duty to disclose.

### D.  Plaintiff's Equitable Claims

Defendant moves to dismiss Plaintiffs' equitable claims in the CLRA, UCL, FAL, and unjust enrichment causes of action on the grounds the Court lacks equitable jurisdiction.  A federal court lacks equitable jurisdiction of equitable claims when a plaintiff has an adequate legal remedy for the same conduct. *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022); *Sonner v. Premier Nutrition Corp.*, 971 F. 3d 834, 844 (9th Cir. 2020).  While this Court has declined to address the issue at the motion to dismiss stage, *see, e.g., Biederman v. FCA LLC*, 765 F. Supp. 3d 920, 944 (N.D. Cal. 2025), as explained at oral argument, if dismissal of the equitable claims, and in particular, the UCL claim, will shorten the class period, whether the Court has equitable jurisdiction probably should be resolved before class certification, or maybe even class certification discovery.  So, in their amended complaint, Plaintiffs should attempt to plausibly allege why their legal remedies are not adequate.

15

**CONCLUSION**

For the reasons explained above, the Court GRANTS Defendant's Motion to Dismiss as to all Counts. As all the pleading shortcomings this Order identifies are curable, the Court grants leave to amend the claims already pled; Plaintiffs may not add new claims or defendants without further leave of court. Any third amended complaint must be filed by November 14, 2025. The Court schedules an initial case management conference for February 25, 2026 at 2:00 p.m. via Zoom video. A joint case management conference statement is due one week in advance.

**IT IS SO ORDERED.**

Dated: October 27, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge