UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK DUVALL,

          Plaintiff,

    v.

HAIER US APPLIANCE SOLUTIONS, INC., dba GE Appliances,

          Defendant.

Case No.  25-cv-02794-JSC

**ORDER RE: DEFENDANT'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

Re: Dkt. No. 49

Plaintiff Mark Duvall brings this putative class action, alleging Defendant failed to disclose defects in two-in-one combination washer dryer appliances ("Class Appliances") manufactured by Defendant GE Appliances.  (Dkt. No. 45.)[1]  In his Third Amended Complaint ("TAC") Plaintiff alleges there are two defects, one in the Appliances' lint trap and another in the duct system, which cause excessive lint buildup and cause the Appliances to fail to dry clothes. Plaintiff also alleges Defendant breached its Limited Warranty by failing to repair the defects.

Plaintiff brings seven causes of action: 1) violation of California's Consumer Legal Remedies Act ("CLRA"), 2) violation of the California False Advertising Law ("FAL"), 3) violation of the California Unfair Competition Law ("UCL"), 4) breach of the implied warranty of merchantability under California's Song-Beverly Act, 5) breach of express warranty under the Uniform Commercial Code § 2-313, 6) breach of the implied warranty of merchantability under California Commercial Code §§ 2314 and 10212, and 7) unjust enrichment.  Defendant moves to dismiss the equitable claims in Counts I-III and VII, as well as Counts V-VI, under Federal Rule

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

of Civil Procedure 12(b)(6).

After considering the parties' submissions, and with the benefit of oral argument on April 9, 2026, the Court GRANTS in part, and DENIES in part, Defendant's motion as set forth below.

BACKGROUND

The following allegations are taken from Plaintiff's TAC.

### I.     The Class Appliances and their Defects

Defendant manufactures "the GE Profile Ultrafast 2-in-1 Washer/Dryer Combo."  (Dkt. No. 45 ¶ 2.)  The Appliance washes and dries clothes in one continuous cycle, and its "two-in-one design is especially attractive to consumers because it appears to save space that would normally be taken up by two different appliances."  (*Id.* ¶ 3.)  "However, the Class Appliances suffer from two defects. Each of these defects independently causes the drier [sic] to fail to dry clothes."  (*Id.* ¶ 33.)  The "heating system in the Class Appliances consists of a drum, a heat pump, and a lint filtration system."  (*Id.* ¶ 27.)  Additionally, there is a "duct through which airflow and debris pass from the dryer before contacting the lint filter."  (*Id.* ¶ 35)  These two systems–the lint filter system and the duct system–contain the two alleged defects which "individually render the appliance unfit for its intended purpose of drying laundry" and which Defendant failed to disclose.  (*Id.* ¶ 26.)

### A. The Lint Filter System Defect

The "lint filtration system," the source of the first defect, "consists of three functional components: a lint trap screen (consisting of both a lint filter mesh and a foam backing), a condensation module, and a water pump and drainage system."  (*Id.* ¶ 29.)  That first component, a "screen," is "positioned in the airflow pathway that connects the drum to the condenser coil and the condensation module."  (*Id.*)

The lint filter's defect lies in the screen.  "[I]f the dryer's lint filtration system is free of defects," lint and debris will be "remove[d]," "capture[d]" by the screen, and "prevent[ed] … from reaching the dryer's condenser … coil."  (*Id.* ¶ 32.)  However, the screen "does not form a seal onto the casing in which the lint trap screen is held."  (*Id.* ¶ 34.)  The failure to "form a seal," in turn, causes "lint and other debris" to build up and become "encased" onto the lint traps' component parts, which "causes the drier to fail to dry clothes" by "trigger[ing] sensors that cause

United States District Court
Northern District of California

the dryer to turn off." (*Id.*)

After identifying the lint trap screen's failure to form a seal, Plaintiff alleges the failure is rooted in *either* a design defect or a manufacturing defect; these theories "are pled in the alternative" to one another "[p]ursuant to Fed. R. Civ. P. 8." (*Id.* ¶¶ 39.) Alleged as a design defect:

> GE designed the lint trap screen to be removable by the consumer for purposes of cleaning the screen. The lint trap screen is designed to slide out of the casing in which the screen is held in its position in the drier between the duct leading from the drum and the condensation module. However, the design of the lint trap screen leaves space open between the screen and the casing[.]

(*Id.* ¶ 42.) Due to that open space between the screen and the casing, lint bypasses the filter and accumulates. (*Id.*) Alternatively, alleged as a manufacturing defect:

> GE designed the Appliances so that the lint trap filters and the casing that houses the filters are molded so that the filters, when inserted, will join together sufficiently tightly to prevent lint from circumventing the filters. However, during the manufacturing process, the lint trap filters and casing are not molded to achieve this aspect of the Appliance's design. As a result of this failure in the manufacturing process to correctly mold the filters and casing according to the Appliance's design, the lint trap filter does not engage with the surrounding casing that holds it in place sufficiently tightly to prevent lint from circumventing the filters.

(*Id.* ¶ 47.)

In other words, Plaintiff alleges two different lint trap system designs. Alleged as a design defect, the lint trap screen was "designed … to be removable by the customer[.]" (*Id.* ¶ 42.) This "design … leaves space open between the screen and the casing," thereby causing lint to bypass the filter and accumulate. (*Id.*) Alleged as a manufacturing defect, "the lint trap filters and the casing are … molded so that the filters, when inserted, will join together sufficiently tightly," but there was a "failure in the manufacturing process to correctly mold" those pieces. (*Id.* ¶ 47.) Under both sets of allegations, lint accumulates, which causes the dryer to fail to dry clothes.

### B. The Duct System Defect

The duct system's defect lies in the way the system regulates airflow. "In a dryer that is free of defects, this duct will allow free passage of air from the drum to the […] lint filter." (*Id.* ¶ 35.) But this free passage of air does not occur because the air traveling through the duct "takes a

3

series of sharp turns before it reaches the filter." (*Id.*) "The angle of the duct at each of these turns slows the rate of airflow, which causes wet lint from the drum compartment to accumulate at the bends of the duct." (*Id.*) The accumulation of lint, in turn, "restricts airflow[,] … which decreases the rate at which air … removes moisture from the clothes[.]" (*Id.*) "Because the defect … causes the dryer to fail to remove moisture … the defect … causes the dryer to fail to dry clothes." (*Id.*) In other words, the root of the duct system defect lies in the "the angle[s]" of the duct's "sharp turns."

For the duct system defect, Plaintiff alleges a design defect and, in the alternative, a manufacturing defect. Alleged as a design defect, the duct is designed to have "sharp angles," and these angles "too sharp to allow sufficient airflow to avoid wet lint accumulating at the 'turns.' As a result, wet lint accumulates, preventing airflow from reaching the dryer sufficient to remove moisture from the drum." (*Id.* ¶ 44.) By contrast, as a manufacturing defect, the duct system's design:

> calls for the duct connecting the drum to the condensation module and condenser coil to be aligned to accomplish two purposes: first, to regulate airflow through the duct so that air does not travel too quickly, which would cause the drier to blow excessive amounts of lint through the lint filter; second, to create sufficient rates of airflow to remove moisture from the drum compartment while avoiding lint accumulation in the duct system.

(*Id.* ¶ 48.) Allegedly, a deviation from this design occurred "during the manufacturing process," when Defendant "attaches the duct … in a manner that runs the duct at sharp angles" which "impede airflow," causing excessive lint accumulation. (*Id.* ¶ 49.) Under either set of allegations, the root of the duct system's problem still lies with "angles." The manufacturing defect theory, though, is these "angles" balance two competing "purposes": air must not "travel too quickly" and spread too much unfiltered lint, but at the same time, there must be "sufficient airflow to remove moisture." (*Id.* ¶ 48.)

## II.    Defendant's Limited Warranty and Product Advertising

Plaintiff attaches Defendant's Limited Warranty to the TAC. The warranty makes two promises. First, "for the period of[ o]ne year [f]rom the original date of purchase[,] we will replace[] [a]ny part of the unit which fails due to a defect in materials or workmanship. During this

4

limited one-year warranty, we will also provide, free of charge, all labor and related service to replace the defective part." (Dkt. No. 45-3 at 2.) Second, "for the period of[ f]ive years [f]rom the original date of purchase[,] we will replace[] [t]he sealed heat pump drying system (compressor, condenser, evaporator, and all connecting tubing) which fails due to a defect in materials or workmanship. During this additional four-year limited warranty, you will be responsible for any labor and related service costs." (*Id.*) The warranty then states:

### EXCLUSION OF IMPLIED WARRANTIES

Your sole and exclusive remedy is product repair as provided in this Limited Warranty. Any implied warranties, including the implied warranties of merchantability or fitness for a particular purpose, are limited to one year or the shortest period allowable by law.

This limited warranty is extended to the original purchase and any succeeding owner for products purchased for home use within the USA. […]

Some states do not allow the exclusion or limitation of incidental or consequential damages. This limited warranty gives you specific legal rights, and you may also have other rights which vary from state to state. To know what your legal rights are, consult your local or state consumer affairs office or your state's Attorney General.

(*Id.*)

Plaintiff also alleges Defendant concealed and omitted the defect in its "drying capacity representations," which Defendant made through two mediums: a "product website" and "specification sheet." (*Id.* ¶ 64.) Defendant's website, hyperlinked in the TAC, "advertises" various things about the Appliance, like how the Appliance is a "'2-in-1 washer/dryer' that 'lets you wash and dry a large load of laundry in about two hours* without needing to transfer the load.'" (Dkt. No. 45 ¶ 64, n.19.) The specification sheet, attached as an exhibit to the TAC, essentially repeats these representations and refers to the Limited Warranty without repeating the warranty's verbatim terms. (*Id.* ¶ 65; Dkt. No. 45-4.) For example, the sheet has a 2x2 table about the Limited Warranty:

5

**WARRANTY**

| Labor Warranty | Limited 1-year entire appliance |
|---|---|
| Parts Warranty | Limited 1-year entire appliance<br>Limited 5-year sealed system<br>Limited 10-year motor |

(Dkt. No. 45-4.)  Plaintiff alleges the sheet is "specifically addressed to consumers who are end-users" because "[i]t contains instructions to the consumer as to how to install the Appliances and other requirements for in-home use of the Dryer."  (Dkt. No. 45 ¶ 75.)

Plaintiff also alleges Defendant's statements are still available online:

> Plaintiff continues to see the Appliance available for purchase on GE's website and product specification sheet, which continue to contain the Drying Capacity Representations. However, Plaintiff Duvall is and continues to be unable to rely on the truth of the Drying Capacity Representations, because he does not know the meaning or import of these representations, including whether GE has corrected the Lint Trap Defect and the Duct System Defect, such that the Drying Capacity Representations are no longer false. Plaintiff Duvall would buy a new Appliance if he could rely on the Drying Capacity Representations.

(*Id.* ¶ 113.)

### III.    Plaintiff's Experience with His Appliance

Plaintiff alleges he bought his appliance on "October 27, 2023." (*Id.* ¶ 98.)  The Appliance cost $2,199 and Plaintiff "paid $2,417.24 to buy it." (*Id.* ¶¶ 37, 98.)  "Plaintiff Duvall decided to buy the Appliance after viewing, and on the basis of, the Drying Capacity Representations on GE's website and in its product Specification Sheet" and he "would not have bought the Appliance if the GE website or product specification sheet had contained information about the Defects." (*Id.* ¶¶ 99, 102.)  "Had GE Appliances disclosed the Defects and their effects on the Appliance's dryer system, Plaintiff Duvall would not have purchased his Class Appliance." (*Id.* ¶ 110.)

The Appliance "came with" defects which "began to manifest" in "June 2024." (*Id.* ¶ 98.)  That same month, "Plaintiff Duvall stopped using the dryer function of the Appliance" but "continued to use the wash setting of the Appliance." (*Id.* ¶ 104.)  Later, Plaintiff "requested a service call from GE on September 20, 2024," which led to the following interaction:

> The service technician visited Duvall's home in late September and

said, upon seeing the Class Appliance, "oh, you have the monster?" and described problems that other consumers had encountered with it. The service technician disassembled the dryer and, using professional cleaning equipment, proceeded to scrape lint out of the Appliance's duct system, the lint trap area, and off of the condenser and evaporator coils, in addition to lint that had accumulated in other parts of the Appliance. These areas would not have been accessible without disassembling the dryer. The technician performed no other service or repair aside from removing the lint. The technician did not replace any component of the Appliance. Instead, he encouraged Plaintiff Duvall to buy a home warranty to offset future issues with the Appliance.

(*Id.* ¶¶ 105.) "Two months later, in November 2024, the dryer again stopped drying clothes[.]"

(*Id.* ¶ 108.) Plaintiff's TAC includes "an image of the quantity of lint that had accumulated behind the lint filter screen in" his Appliance. (*Id.* ¶ 47.)

**DISCUSSION**

**I.    Express Warranty Claims (Count V)**

Count V asserts two theories as to why Defendant violated an express warranty: 1) Defendant failed to replace parts, in violation of the product's Limited Warranty, and 2) the Appliances' failure to dry clothes violated Defendant's advertising and product information. The Court previously dismissed Plaintiff's express warranty claims under both theories, with leave to amend, because Plaintiff did not plausibly allege a manufacturing defect to which the Limited Warranty applies and Plaintiff did not specify what statements they relied upon. (Dkt. No. 28 at 3-5.) Defendant again moves to dismiss both theories. The motion asserts the same basis for both theories: "Plaintiff shows no failure … to comply with the Limited Warranty[] … and thus he has no claim based on statements outside the Limited Warranty either." (Dkt. No. 49 at 25.) So, both theories hinge on the Limited Warranty.

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Group., Inc.*, 505 U.S. 504, 525–526 (1992). Here, Defendant provided an express Limited Warranty to "replace … any part of the unit which fails due to a **defect in materials or workmanship.** During this limited one-year warranty, we will also provide, free of charge, all labor and related service to replace the defective part." (Dkt. No. 45-3 at 2 (emphasis added).) Defendant asserts the TAC does not plausibly allege a "defect in materials or workmanship" or that it breached the warranty by failing to replace

7

a part of the unit that failed due to said defect.  The Court disagrees on both points.

### A. Plaintiff Plausibly Alleges a Manufacturing Defect

The parties agree a warranty covering defects in "materials or workmanship" applies to manufacturing defects under California law.  "California recognizes two distinct categories of products defects: manufacturing defects and design defects."  *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1119 (2002).

> A manufacturing defect exists when an item is produced in a substandard condition. Such a defect is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line. A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective.

*Id.* at 1119–20.  The contrasting definitions of manufacturing defects and design defects, as explained in *Horvath v. LG Electronics Mobilecomm U.S.A., Inc.*, 2012 WL 2861160 (S.D. Cal. Feb. 13, 2012), mean a warranty covering "defects in materials and workmanship" applies to manufacturing defects, as opposed to design defects which make a product "inherently defective." *Id.* at *5 (citing *McCabe*, 100 Cal. App. 4th at 1119-20 and collecting federal district court cases).

Here, Plaintiff alleges facts that plausibly support an inference of a defect in materials or workmanship.  Under the lint trap system's manufacturing defect theory, the lint trap was designed so the casing and filter "join together sufficiently tightly," but there was a "failure in the manufacturing process to correctly mold the filters and casing" such that these components are not joined "sufficiently tightly."  (Dkt. No. 45 ¶ 47.)  In that sense, the "item is produced in a substandard condition" and plausibly supports an inference of a defect in workmanship.  *McCabe*, 100 Cal. App. 4th at 1119–20.  Similarly, alleged as a manufacturing defect, the duct system's design must balance two seemingly competing "purposes:" air must not "travel too quickly" to "blow excessive amounts of lint," but at the same time, there must be "sufficient … airflow to remove moisture … while avoiding lint accumulation."  (Dkt. No. 45 ¶ 48.)  As alleged, Defendant balanced these interests by designing the duct system to have certain "angles" through which air travels, yet, the Appliance deviates from this intended purpose because "during the manufacturing process, GE attaches the duct … in a manner that runs the duct at sharp angles"

United States District Court
Northern District of California

which "impede airflow." (*Id.* ¶ 49.) So, under Plaintiff's manufacturing defect theory, and drawing all reasonable inferences in Plaintiff's favor, the "substandard condition" or faulty workmanship lies in the "sharp angles," which impedes the Appliance's intended purpose with respect to balancing airflow, lint accumulation, and removal of moisture. (*See id.*) Plaintiff also alleges his unit "came with" these two defects and experienced symptoms of the defects (lint accumulation and failure to dry clothes) beginning in June 2024. (*Id.* ¶ 98.) His allegations include a photo showing "the quantity of lint that had accumulated behind the lint filter screen" in his Appliance. (*Id.* ¶ 47.)

Additionally, drawing inferences in Plaintiff's favor, the allegations of varying consumer complaints are consistent with a manufacturing defect. Plaintiff alleges, and attaches as exhibits, "hundreds of complaints related to the Class Appliances' poor drying performance." (Dkt. No. 45 ¶ 60; *see generally id.* ¶¶ 55-63; Dkt. No. 45-1.) Across these complaints, consumers experienced varying times and intensities at which the lint accumulated and failure to dry clothes. (*See generally* Dkt. No. 45-1.) Drawing inferences in Plaintiff's favor, these variations plausibly support an inference there are manufacturing defects. In particular, Plaintiff alleges the lint trap's molding was not "sufficiently tight[]," and the duct system's angles were too "sharp," which caused air to travel "too quickly." (Dkt. No. 45 ¶¶ 48-49.) Whether something is too "tight[]"or too "sharp" is consistent with a manufacturing error because design specifications often require certain angles or degrees of tightness, which inherently can vary by degree. For instance, suppose two customers have appliances that were defectively manufactured, but each appliance varied in the lint trap's tightness or the duct system's angles. Drawing inferences in Plaintiff's favor, these variations in the defect are consistent with the variations in time and severity experienced by other customers; perhaps a dryer takes longer to malfunction based on the rate of lint accumulation, which is a function of the degree of "tightness" or "sharpness" in the defect. (*See, e.g.*, *id.* ¶ 34 (alleging "the rate at which lint bypasses the filter" increases as lint accumulates because lint "pushes the lint trap further off the casing, thus widening the gap through which lint and debris pass[.]"), ¶ 35 (alleging "[t]he angle of the duct at each of these turns slows the rate of airflow, which causes wet lint … to accumulate," and thereby "restrict[] airflow")).) Put another way, the

defects are alleged as matters of degree (tightness and sharpness), so it is plausible the resulting failures to dry also vary by degree (severity and timing).

For that reason, Defendant's argument Plaintiff has not alleged facts about "any manufacturing process, any purported manufacturing error, or to show how his unit deviated from any others" (Dkt. No. 49 at 20) is unavailing.  True, Plaintiff does not allege any facts about the manufacturing process, except issues with the "manner" in which Defendant "attache[d] the duct … at sharp angles," which impedes airflow.  (Dkt. No. 45 ¶ 49.)  But unlike Defendant's cited cases, Plaintiff's allegations of a manufacturing defect are not boilerplate because he alleges designs (sufficiently tight molding and angles that sufficiently balance airflow) from which the actual products deviated.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, 754 F. Supp. 2d 1208, 1222–23 (C.D. Cal. 2010) (plaintiff alleging "systems and their components were defectively designed and manufactured in that they were highly susceptible to malfunction" and the product "failed to conform with its manufacturing specifications …"); *Trabakoolas v. Watts Water Techs., Inc.*, 2012 WL 2792441, at *4 (N.D. Cal. July 9, 2012) (Plaintiffs alleging only the "'selection of a low-grade plastic for the coupling's material' and the manner in which threading was cut into the sidewall of the plastic nuts," and Plaintiffs did not "articulate[] how [this] … distinguishes the [product] at issue from either the manufacturer's intended result or other seemingly identical product models."); *Mercado v. Audi of Am., LLC*, 2020 WL 5413835, at *9 (C.D. Cal. May 15, 2020) ("Plaintiffs expressly allege that '[t]he Vehicles were unfit for their intended uses by reason of the Brake Defect in their manufacture, design, testing, components, and constituents, so that they would not safely serve their ordinary and intended purpose' and that 'Defendant designed and/or manufactured the Vehicles defectively, causing them to fail to perform as safely as an ordinary customer would expect.'"); *State Farm Gen. Ins. Co. v. Gen. Electric. Co.*, 2025 WL 2937533, at *4 (C.D. Cal. Sep. 8, 2025) ("[N]owhere does Plaintiff alleges that this defect deviated in any way from the intended design."); *Sater v. Chrysler Grp. LLC*, 2015 WL 736273, at *4 (C.D. Cal. Feb. 20, 2015) (Plaintiff alleging "inherent design and/or manufacturing defects," but other allegations Defendant "completely redesigned newer models to fix the … defects … indicat[ed] the trucks were built in

the [intended] manner.")  Whether the defects in sharpness or tightness are by design or by manufacturing is a question of fact that cannot be resolved at the motion to dismiss stage.

### B.  Plaintiff Plausibly Alleges a Breach of the Limited Warranty

Plaintiff alleges facts sufficient to support an inference Defendant breached the Limited Warranty.  The one-year warranty provides "we will replace[] [a]ny part of the unit which fails due to a defect in materials or workmanship."  (Dkt. No. 45-3 at 2.)  Given Plaintiff has plausibly alleged manufacturing defects that impair various component parts of the lint trap system and the duct system, there is at least "one part of the unit which fail[ed] due to a defect in materials or workmanship."  (*Id.*; *see generally* Dkt. No. 45 ¶¶ 27-49.)  The Limited Warranty's terms therefore require Defendant to "replace" any part which failed within the applicable warranty period.  (Dkt. No. 45-3 at 2.)  Drawing inferences in Plaintiff's favor, Defendant did not do so because Plaintiff "requested a service call from GE on September 20, 2024," then a technician "disassembled the dryer and[ …] scape[d] lint out of the Appliance's duct system, the lint trap area, and off of the … coils[.]"  (Dkt. No. 45 ¶ 105.)  Crucially, "[t]he technician did not replace any component of the Appliance."  (*Id.*)  "Two months later, in November 2024, the dryer again stopped drying clothes[.]"  (*Id.* ¶ 108.)

Under *Rutledge v Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015), allegations of an inadequate repair within the warranty period are sufficient to permit an inference Defendant breached the warranty.  There, the plaintiff purchased a laptop, experienced problems with the display screen due to a defect with the laptop's "inverter," then submitted the laptop to the defendant, HP, for repair within the one-year warranty period.  *Id.* at 1171.  "HP replaced the inverter" and returned the laptop to the plaintiff, who stated the laptop "worked 'great'" at the time.  *Id.* at 1182.  However, the screen problems eventually manifested again, roughly two years later and outside the warranty period.  *Id.*  Ultimately, the California Court of Appeal held, on those facts, a reasonable trier of fact could find HP breached the warranty by performing an inadequate repair: HP "did not return her computer to her in a condition as warranted, namely, to be free from defect. In fact, the computer was returned to her in a defective condition, which was a breach of warranty."  *Id.*  Similarly, here, Plaintiff's allegations plausibly support an inference

11

Defendant's technician did not re-assemble the Appliance and return it "to [him] in a condition as warranted, namely to be free from defect. In fact, the [Appliance] was returned … in a defective condition, which was a breach of warranty." *Id.* at 1182-83.

Defendant's arguments to the contrary are unavailing. First, Defendant emphasizes there is no allegation Defendant "[d]eclined a request for warranty service" or "failed or refused to provide coverage." (Dkt. No. 49 at 21.) But *Rutledge* did not hinge on whether the plaintiff re-presented the laptop for repair after the warranty period; the court held "the breach of warranty" "was" that "the computer was returned to her in a defective condition." 238 Cal. App. 4th at 1182–83. So, drawing inferences in Plaintiff's favor, Plaintiff has plausibly alleged a breach of the express warranty.

Second, Defendant distinguishes this case from *Rutledge*, and likens Plaintiff's allegations to two other cases: *Cadena v. Am. Honda Motor Co., Inc.*, 2018 WL 8130613 (C.D. Cal. Nov. 14, 2018) and *Lyman v. Gen. Motors LLC*, 2025 WL 2080654 (C.D. Cal. Mar. 19, 2025). Neither case is persuasive. The *Cadena* court did not discuss California case law, let alone *Rutledge.* Instead, the court there rejected allegations of an inadequate repair following a single visit because "nowhere does the [warranty] guarantee that the initial repair will resolve that issue such that a follow-up visit will not be necessary." 2018 WL 8130613, at *5. *Cadena* did not cite California authority for its holding a warranty must contain that level of specificity for a plaintiff to allege an inadequate-repair theory of breach. That approach is inconsistent with *Rutledge*, which interpreted a warranty "to you, the end consumer, that [the product] will be free from defects in materials and worksmanship," and held it "was a breach of warranty" to return a product in a defective condition. 238 Cal. App. 4th at 1179, 1182–83. Similarly, *Lyman* merely relied on *Cadena*, instead of California law. *See* 2025 WL 2080654, at *5.

So, the Court denies Defendant's motion to dismiss Plaintiff's express warranty claims. Given Plaintiff has plausibly alleged a breach of the limited warranty within the one-year period, the Court does not reach Plaintiff's argument the warranty's remedial limitations are unconscionable.

### II.     Implied Warranty Claim (Count VI)

United States District Court
Northern District of California

Defendant moves to dismiss Plaintiff's California Commercial Code implied warranty claim on two grounds. First, "Plaintiff's inability to allege denial of express warranty coverage also bars the implied warranty claim." (Dkt. No. 49 at 26.) Given Plaintiff plausibly alleges a violation of the express warranty, Defendant's first argument fails. Defendant's second basis for dismissing the implied warranty claim is Plaintiff has not alleged vertical privity between Plaintiff and Defendant. The Court agrees. "Under California Commercial Code section 2314, … a plaintiff asserting breach of [implied] warranty claims must stand in vertical contractual privity with the defendant." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (internal citations omitted). "Thus, an end consumer such as [Plaintiff] who buys from a retailer is not in privity with a manufacturer," and therefore cannot state an implied warranty claim. *Id.* at 1023-24 (holding a lack of vertical privity required dismissal of the plaintiff's California implied warranty claim).

Plaintiff opposes on the grounds there is an intended beneficiary exception to the vertical privity requirement. In particular, in *Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65 (1978), the California Court of Appeal held in a construction defect case that California's third-party beneficiary statute—Civil Code § 1559—"permit[s] a third party to bring an action even though he is not specifically named as a beneficiary, if he is more than incidentally benefitted by the contract." *Id.* at 69; *see also* Cal. Civ. Code § 1559 ("A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."). Plaintiff also cites *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004 (2009), which held a tenant who is an intended beneficiary of a lease may bring claims against her landlord under the lease, tort theories, and California Civil Code sections governing landlord-tenant relationships. *Id.* at 1021–27. So, argues Plaintiff, given he is a third-party beneficiary of Defendant's "sales", he need not allege vertical privity. (Dkt. No. 50 at 22-23.)

But *Clemens*—binding Ninth Circuit precedent—holds otherwise. In *Clemens*, the Ninth Circuit affirmed dismissal of a plaintiff's implied warranty claim against a car manufacturer for lack of privity. 534 F.3d at 1021-24. After holding a plaintiff asserting breach of an implied

13

United States District Court
Northern District of California

warranty under California law "must stand in vertical contractual privity with the defendant," the court observed "[s]ome particularized exceptions to the [privity requirement] exist." *Id.* at 1023. "The first arises when the plaintiff relies on written labels or advertisements of a manufacturer." *Id.* "The other exceptions arise in special cases involving foodstuffs, pesticides, and pharmaceuticals, and where the end user is an employee of the purchaser." *Id.* (collecting three California Court of Appeal decisions). The *Clemens* court then noted the appellant argued the exceptions identified by the Ninth Circuit "are exemplary rather than exhaustive, and that similar equities support an exception for his case." *Id.* The Ninth Circuit disagreed: "California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314, and a federal court sitting in diversity is not free to create new exceptions to it." *Id.* at 1024. So, the lack of privity in the plaintiff's consumer product case "require[d] dismissal of Clemens's implied warranty claims" under California Commercial Code section 2314. *Id.; see also Wong v. Am. Honda Motor Co.*, 2024 WL 612939, at *1 (9th Cir. Feb. 14, 2024) (affirming dismissal of California implied warranty claims arising from defective vehicles because California law requires "that a buyer establish contractual privity with a manufacturer").

Plaintiff's insistence *Clemens* does not apply because it did not consider *Gilbert Financial Corp.* and an intended beneficiary exception later applied in the landlord-tenant context is unpersuasive. First, district courts, as well as Ninth Circuit three-judge panels, are bound by Ninth Circuit prior decisions interpreting state law "in the absence of intervening controlling authority." *F.D.I.C. v. McSweeney*, 976 F.2d 532, 535 (9th Cir. 1992). As this Court has previously held, "*Gilbert* was decided before *Clemens*, so it cannot be the basis for a different interpretation of California law." *Biederman v. FCA US LLC*, 765 F. Supp. 3d 920, 949 (N.D. Cal. 2025). Plaintiff does not identify any California authority holding the long-standing vertical privity requirement of the implied warranty of merchantability under Commercial Code section 2314 has a third-party beneficiary exception; *Spinks* addressed claims arising under tort, a real estate lease, and California's Civil Code. So, there is no intervening authority.

Second, we do not know whether *Clemens* considered *Gilbert Financial* and the intended beneficiary contract doctrine; maybe the plaintiff argued for such an exception in its brief or at

14

United States District Court
Northern District of California

oral argument but the Ninth Circuit did not consider it worth mentioning in its opinion.

Third, Plaintiff in any event, does not cite any case that says a district court can disregard Ninth Circuit binding precedent on a question of a law based on an argument that was not made to the Ninth Circuit. The existing law from other circuits is to the contrary. *See Hoskins v. Withers*, 92 F.4th 1279, 1286 n.3 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1468 (2025); *Tippitt v. Reliance Standard Life Ins.*, 457 F.3d 1227, 1234 (11th Cir. 2006) (stating the court of appeals was bound by panel precedent even when the appellant makes arguments not considered by the prior panel); *Harris v. Epoch Grp.*, 357 F.3d 822, 826 (8th Cir. 2004) (stating "precedents do not cease to be authoritative merely because counsel in a later case advance a new argument") (quoting *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995)); *In re Penn Central Transp. Co.*, 553 F.2d 12, 15 (3d Cir. 1977) (stating a precedent controls even when an appellant makes an argument not considered by the prior panel). Such precedent is unsurprising given Plaintiff's version of what is binding authority would require courts to scour appellate briefs and oral argument transcripts and then make a finding as to whether a panel considered a particular argument. Such a *stare decisis* rule is unworkable.

Accordingly, the Court grants Defendant's motion as to Plaintiff's Commercial Code implied warranty claim (Count VI).

### III.    Plaintiff's Equitable Claims (Counts I-III and Count VII)

Defendant moves to dismiss Plaintiff's equitable claims (Counts I-III and VII) "because Plaintiff seeks money damages, [so] an adequate legal remedy exists on the face of the TAC" and Plaintiff "alleges no *facts* showing that its legal remedies are inadequate." (Dkt. No. 49 at 15) (emphasis in original). To explain why he lacks an adequate remedy at law, Plaintiff alleges:

> Plaintiff seeks equitable relief that is more certain than damages and that cannot (at this time in the litigation) be determined to be equivalent to damages. In particular, Plaintiff seeks restitutionary relief, including rescission. *See, e.g., Spann v. J.C. Penney Corp., 2015 WL 1526559*, at *6 (C.D. Cal. Mar. 23, 2015) (holding "rescission with complete restitution" available under FAL and UCL; citing California authorities). The Court may award restitution in the full amount of Plaintiff'[s] purchase price if the factfinder finds that Plaintiff would not have bought the Appliances but-for GE's representations. *See id.* Even if the Court determines that rescission with restitution involving a full refund is inappropriate and that the

15

> restored purchase amounts must be offset by any value received, the offset to the purchase price would be equal to value received for the period prior to Plaintiff's return of his Appliances in rescission; in contrast, a damages award would not involve return of the Appliances, and so the value-received offset would calculate the value to be deducted from the purchase price for a greater time period (up to and including the anticipated useful life of the functional components of the Appliances). Thus, even if a rescission remedy includes a deduction for value received, the amount of the deduction from purchase price will be less in the case of rescission with restitution than it would for damages.

(Dkt. No. 45 ¶ 97.)  So, Plaintiff's allegations clarify his damages remedy is inadequate because his equitable claims seek a full refund or, alternatively, rescission and restitution paired with a return of the product.

Defendant's motion responds (1) Plaintiff is not entitled to a full refund because "he received value from using his Combo for at least several months" and (2) "rescission is a contract remedy, and it does not apply because Plaintiff bought his combo from a third-party retailer, not GE appliances." (*Id.* at 16-17) (cleaned up).  The Court agrees on both points.

### A.  A Full Refund is Unavailable

Under California law, a full refund is available as a restitution measure only "when the plaintiffs prove the product had *no* value to them." *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015) (italics in original).  Rather, "the proper measure of restitution" is "the difference between the price paid and the actual value received." *Id.* at 787, 794 (citing the measure of restitution set forth in *In Re Vioxx Class of Cases*, 180 Cal. App. 4th 116, 131 (2009)).  Although "*Vioxx* does not purport to set forth the exclusive measure of restitution *potentially* available in a UCL case[, …] plaintiffs ha[ve] the burden of proving entitlement to an alternative measure proper under all the circumstances." *Tobacco II*, 240 Cal. App. 4th at 792 (italics in original). And when the "circumstances" show plaintiff "obtain[s] value from [the product] apart from the deceptive advertising," a "full refund theory does not provide a[] … basis for restitution." *Id.* at 794.

Here, drawing all inferences in Plaintiff's favor, a full refund is unavailable because Plaintiff's allegations compel the inference he obtained value from his product.  Plaintiff does not allege he obtained no value from his Appliance; instead, he alleges the defects "diminished the

16

value" of his unit.  (Dkt. No. 45 ¶ 109.)  Plaintiff alleges he purchased the product in October 2023, then in June 2024 he "stopped using the dryer function of the Appliance" and "continued to use the wash setting."  (*Id.* ¶¶ 103, 104.)  Plaintiff's express allegation he "continued to" wash his clothes means he cannot "prove the product had *no* value" to him, and therefore, a "full refund theory does not provide an alternative basis for restitution."  *Tobacco II*, 240 Cal. App. 4th at 794-95 (emphasis in original).

Plaintiff's authority to the contrary is unavailing because it does not address the portion of *Tobacco II* that expressly ruled a full refund is unavailable to plaintiffs who obtain value from the deceptively advertised product.  Plaintiff's primary case, *Spann v. J.C. Penney Corp.*, 2015 WL 1526559 (C.D. Cal. Mar. 23, 2015), reasoned it could not find California "authority indicating that [difference in value] is the only way restitution can be calculated," but that decision was published six months before *Tobacco II*.  2015 WL 1526559 at *6.  Therefore, *Spann*'s analysis of California law is unpersuasive because it is outdated.  Similarly, *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015), was issued before *Tobacco II* and expressed "no opinion" about a full refund theory for calculating restitution.  *See* 802 F.3d at 989 & n.9.  For that same reason, *Abbit v. ING USA Annuity*, 2015 WL 7272220 *7 (S.D. Cal. Nov. 16, 2015), which relied on *Pulaski*, is unpersuasive.  Plaintiff's other Ninth Circuit cases did not address a full refund theory or restitution, either.  *See Mier v. CVS Health*, 2023 WL 4837851, at *2 (9th Cir. July 28, 2023); *Nguyen v. Nissan North Am., Inc.*, 932 F.3d 811, 821 (9th Cir. 2019) (noting the plaintiff "was not seeking a full refund").

Another case, *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931 (S.D. Cal. 2019), held a full-refund model is available because the plaintiff, like Plaintiff here, alleged "she would not have purchased the [product], despite its benefits, had it been marketed accurately."  *Id.* at 952. *Krueger*'s discussion of *Tobacco II* is unpersuasive.  The *Krueger* court highlighted the quote "the difference in price paid and value received is [not] the only proper measure of restitution," then observed *Tobacco II*'s holding was "not because of a categorical ban on alternative measures of restitution but because the plaintiffs failed to adduce sufficient evidence to support their theory." 396 F. Supp. 3d at 951 (cleaned up).  Yes, it is a plaintiff's burden to support a theory of

17

restitution, but *Krueger* did not address *why* the *Tobacco II* plaintiffs failed to support a full refund theory: the plaintiffs could not "prove the product had *no* value" to them. 240 Cal. App. 4th at 794–95. The same is true of Plaintiff here, albeit under a pleading standard: drawing all inferences in Plaintiff's favor, Plaintiff's allegations compel the inference he obtained value from the product, and he therefore fails to adduce facts sufficient "to support his full refund theory."

Finally, Plaintiff's reliance on *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310 (2011) is misplaced because *Kwikset* cannot reasonably be interpreted to suggest a full refund is available under Plaintiff's allegations here. The plaintiffs in *Tobacco II* cited *Kwikset* to argue restitution was available for deterrence purposes, but as *Tobacco II* aptly explained, *Kwikset* "is a[] standing case" and therefore "does not suggest restitution is available for" that purpose. *See* 240 Cal. App. 4th at 798; *see also Kwikset*, 51 Cal. 4th at 330 (noting "[a] consumer who relied on a product label and challenges a misrepresentation contained therein **can satisfy the standing requirement** [for UCL claims] by alleging … he or she would not have bought the product but for the misrepresentation.") (emphasis added). Additionally, *Tobacco II* emphasized *Kwikset*'s procedural history: the trial court in *Kwikset* had previously "denied restitution," then the plaintiffs later "filed an amended complaint"; "[c]onsistent with the trial court's denial of restitution, the amended complaint did not pray for such relief." *See* 240 Cal. App. 4th at 798–99. Consequently, *Kwikset* cannot be read to suggest Plaintiff may be entitled to a full refund.

So, Plaintiff's allegations, read with the required liberality, do not permit the Court to order a full refund under the UCL. Because Plaintiff has not pleaded his entitlement to a full refund measure of restitution, he cannot show his available damages remedy is inadequate.

### B. Rescission With Restitution and Product Return is Unavailable

Plaintiff's alternative prayer, rescission coupled with return of his product, is also unavailable. Plaintiff has "the burden of proving entitlement" to this measure of restitution. *Tobacco II*, 240 Cal. App. 4th at 792. Plaintiff relies on *People v. Superior Court* ("*Jayhill*"), 9 Cal. 3d 283 (1973), which held the UCL authorizes restitution remedies such as an order requiring "defendants … to offer each customer … the opportunity to rescind his contract, return the products, and obtain a refund." *Id.* at 286. That is what Plaintiff requests here: rescission, return,

18

and refund, except Plaintiff asks to rescind his contract with the third-party retailer who is not a party to the case and to return his product to either the non-party retailer or to Defendant, from whom he did not purchase the product.

Plaintiff has thus failed to show he is entitled to his alternative prayer because none of Plaintiff's cases ordered either (1) rescission between a plaintiff and a non-party to the case, (2) rescission between a plaintiff and a non-contracting party, or (3) return of a product to a non-contracting party. Of Plaintiff's cited cases which ordered restitution in the absence of contractual privity, none ordered rescission. *See generally Shersher v. Sup. Ct.*, 153 Cal. App. 4th 1491 (2007); *Troyk v. Farmers Grp. Inc.*, 171 Cal. App. 4th 1305, 1340 (2009); *Schramm*, 2014 WL 7869336 at *9-10. And every case that addressed rescission of contract did so between contracting parties. *See Jayhill*, 9 Cal. 3d at 286; *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 (2000); *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 810 (N.D. Cal. 2021). So, Plaintiff's cases merely show a court can order restitution in the absence of contractual privity, but that does not mean the UCL authorizes a court to order rescission and return to non-parties and/or to non-contracting parties because "[t]he two remedies are distinct." *See People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 133 (2003), *as modified on denial of reh'g* (Sept. 9, 2003).

So, as Plaintiff's CLRA, Song-Beverly implied warranty, and express warranty legal claims are proceeding, and Plaintiff has not alleged facts or law that plausibly suggest the remedies for these claims are inadequate, the Court grants Defendant's motion and dismisses Plaintiff's monetary equitable claims without prejudice to pursuing the claims in state court.[2] *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313-14 (9th Cir. 2022) (holding the federal court did not have equitable jurisdiction in light of the plaintiff's CLRA damages claim and so the plaintiff's California UCL claim had to be dismissed without prejudice to refile the same claim in

---

[2] The Court's dismisses Plaintiff's unjust enrichment claim (Count VII) for this reason as well. Plaintiff's unjust enrichment claim requests disgorgement of "profits, benefits, and other compensation wrongfully obtained by GE Appliances" (Dkt. No. 45 ¶ 218), but Plaintiff's Opposition did not explain why he lacks an adequate monetary remedy in light of his CLRA, Song-Beverley implied warranty, and express warranty claims.

state court).

### IV.    Injunctive Relief

Plaintiff's request for injunctive relief asks "to prevent GE from" (1) "continuing to market and sell its appliances using the Drying Capacity Representations on its website and product specification sheet […] unless and until the Defects are corrected by GE," and (2) "enforcing the undisclosed remedial limitations in its 'Limited Warranty' document." (Dkt. No. 45 ¶ 94.) Defendant moves to dismiss Plaintiff's request for injunctive relief because Plaintiff has not sufficiently alleged an injury-in-fact to support Article III standing.

To invoke Article III standing, "a plaintiff bears the burden of demonstrating that her injury-in-fact is 'concrete, particularized, and actual or imminent.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "For injunctive relief, which is a prospective remedy, the threat of injury must be 'actual and imminent, not conjectural or hypothetical.'" *Davidson*, 889 F.3d at 967 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "[T]he 'threatened injury must be *certainly impending* to constitute injury in fact' and 'allegations of *possible* future injury are not sufficient.'" *Davidson*, 889 F.3d at 967 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (emphasis in *Davidson*). For CLRA, FAL, and UCL claims seeking injunctive relief, *Davidson* held:

> a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an "actual and imminent, not conjectural or hypothetical" threat of future harm. *Summers*, 555 U.S. at 493[.] Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to. […] In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved. […] Either way, […] we are not persuaded that injunctive relief is *never* available for a consumer who learns after purchasing a product that the label is false.

20

889 F.3d at 969–70.  Although the issue is close, drawing reasonable inferences in Plaintiff's favor, he sufficiently alleges Article III standing to pursue injunctive relief.  He alleges he continues to see "the Appliance available for purchase on GE's website and product specification sheet," which supports an inference he is interested in purchasing the Appliance if he knew the representations about its drying capacity were true.  (Dkt. No. 45 ¶ 113.)  And, he specifically alleges he would purchase a new Appliance if he could rely on the drying representations. (*Id.*) Discovery may show that he does not have standing to obtain injunctive relief, but at this juncture, and given this demand does not materially change how the case will proceed, the Court denies Defendant's motion to dismiss.

**CONCLUSION**

For the reasons set forth above, the Court grants in part and denies in part Defendant's motion to dismiss.  The Court denies Defendant's motion as to Plaintiff's express warranty claim because Plaintiff has plausibly alleged a manufacturing defect and breach of the Limited Warranty, but grants the motion as to Plaintiff's implied warranty claim with prejudice and without leave to amend based on lack of contractual privity.  The Court also grants the motion to dismiss the equitable claims without leave to amend, but without prejudice to Plaintiff pursuing those claims in state court.

The Court sets a case management conference for May 6, 2026 at 2:00 p.m. by Zoom video.  An updated joint statement that reflects the parties' current scheduling proposals, as well as the status of any proposed amended complaint that includes claims from the New York case, must be filed one week in advance.

This Order disposes of Docket No. 49.

**IT IS SO ORDERED.**

Dated: April 13, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

21